UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | 20CR00922 |
| | Judge Manish S. Shah |
| CARLOS SMITH, | |
| Defendant. | |

**DEFENDANT'S SENTENCING MEMORANDUM AND OBJECTIONS TO THE PRESENTENCE REPORT**

Defendant, Carlos Smith, by his attorney, Dena M. Singer of Bedi & Singer, LLP, respectfully requests, under 18 U.S.C § 3553(a) and *United States v. Booker*, 543 U.S. 220 (2005), and its progeny, that this Court impose a sentence of 28 months followed by a term of supervised release. In support of this request, Carlos states as follows:

**I.   OVERVIEW OF SENTENCING REQUEST**

A sentence of 28 months is sufficient but not greater than necessary to meet the purposes of sentencing due to the nature and circumstances of the offense, Carlos' turbulent and violent childhood, the physical abuse he suffered and witnessed at the hands of his father, his service in the United States Air Force, and his desire to do better.

**II.   IN CONSIDERING THE § 3553 FACTORS, CARLOS' PERSONAL HISTORY AND CHARACTERISTICS, A SENTENCE OF 28 MONTHS IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY, TO MEET THE PURPOSES OF PUNISHMENT**

When this Court looks at the totality of Carlos' life, it will find the requested sentence is appropriate. The United States Supreme Court has determined a defendant's history and characteristics are "clearly relevant to the selection of an appropriate sentence," and each

1

sentence must "fit the offender and not merely the crime." *Pepper v. United States,* 562 U.S. 476, 488, 492 (2011). The sentencing court must make an "individualized assessment based on the facts presented." *Gall v. United States,* 552 U.S. 38, 50 (2007); *Koon v. United States,* 518 U.S. 81, 113 (1996) (The sentencing judge "consider[s] every convicted person an individual and every case as a unique study in the human failing"). When considering all the § 3553(a) factors, this Court will gain a fuller and clearer picture of Carlos, showing a sentence of 28 months is appropriate.

### A. Carlos' personal history and characteristics justify a sentence of 28 months

Carlos' difficult childhood, his service to his country in the United States Air Force, his role as a caregiver for his 74-year-old mother, his age, and his physical and mental health issues are all reasons why a sentence of 28 months is appropriate.

#### 1. Carlos experienced a violent and rough childhood

Carlos was born on June 24, 1964, in Chicago, Illinois to Lillian and Julius Smith, Sr. (PSR, ¶61). He is one of four children born to this union, and he and his siblings remain close. (PSR, ¶61). Carlos' mother is 74 years old and in poor health, and Carlos acts as her caregiver. (PSR, ¶60). Carlos' father passed away in 2003 after suffering a stroke. (PSR, ¶60).

Until Carlos was seven years old, he lived with his family in the Altgeld Gardens Housing Project in Chicago.[1] Carlos recalls this as a perilous and gang-infested neighborhood where he was endangered just walking down the street. (Ex. 1). Carlos' father moved the family out of the projects and into the South Shore neighborhood which, according to Carlos, was no better. (Ex. 1). Gangs were still prevalent in South Shore, and Carlos recalls he was constantly

---

[1] Altgeld Gardens was named Chicago's "toxic doughnut" due to the environmental toxins and hazards which surround the housing project. Due to these toxins the neighborhood has "some of the city's highest rates of cancer" and high statistics of premature births and tumors. Rosalie Chan, *The 40-Year Fight to Clean Up One of America's Most Polluted Projects*, VICE (June 30, 2017)
https://www.vice.com/en/article/59pmvn/this-is-life-in-one-of-americas-most-polluted-housing-projects.

being robbed, jumped, or attacked. (Ex. 1). Carlos related female gang members would try to start a fight so their male counterparts would have a reason to "jump you." (Ex. 1). Often, when he and his brother would go to the store, they would be intimidated by gang members who would hold a knife to his brother's throat. (Ex. 1). When this occurred, Carlos recalled he would give them "everything he could." (Ex. 1). Carlos has a vivid memory of being jumped by gang members and thrown through a window, just because they thought it was "funny" and it "gave them something to do." (PSR, ¶71).

Carlos was also threatened and attacked by individuals whom he believed were there to protect him. On two occasions, he was jumped by a Chicago Police Officer, robbed, and dumped in Latino neighborhoods that were generally hostile to young Black men. (PSR, ¶71). These incidents were more terrifying for Carlos than his encounters with gang members.

The violence Carlos encountered did not stop at his front door, but rather permeated his home. Carlos' home was not a safe haven where he could seek refuge. Instead, it was a site of violence and unpredictability. Carlos' father was an alcoholic who lashed out at his family members when drunk. (Ex. 1). Carlos has vivid recollections of being physically abused at the hands of his father. (PSR, ¶62). He remembers, "my father hit me, hard and a lot." (Ex. 1). His father struck him on his back, legs, arms, in short, "everywhere." (Ex. 1). No one in the family was immune from his father's rage. Carlos remembers watching his mother sobbing as his father pummeled and kicked her. (PSR, ¶62). One of Carlos' most horrifying memories was when his father picked up the baby bed his sister was sleeping in and hurled it across the room, imperiling her life. (Ex. 1). Carlos recalls one night his father came home drunk and kicked down the locked door when his mother refused his father entry. (Ex. 1). Carlos felt trepidation when his father entered their home, never knowing whether the evening would be peaceful or turbulent.

According to Carlos' sister, Jaton, theirs was a strict upbringing with more discipline than joy. (Ex. 2). Carlos was instrumental in providing his siblings with small extras to make their lives less austere and a bit happier. Jaton says, "[w]e were lower-class citizens our father could only provide meals and a roof over our heads if we wanted anything else we had to get out and work for it, [Carlos] carried groceries to cars at the local grocery store just to be able to buy snacks for his siblings he has always had a caring and sharing heart." (Ex. 2). Carlos' turbulent and abusive childhood and his efforts to provide better circumstances for his siblings are reasons why 28 months is the appropriate sentence.

2. *Following his graduation from high school, Carlos enlisted in the United States Air Force*

In 1982, Carlos graduated from South Shore High School in Chicago, where he ranked 45th in his class of 252 students. (PSR, ¶93). Carlos thrived in school and was involved in several sports, including football. (PSR, ¶64). Carlos initially planned to attend college upon graduation, but he had a cousin who was "doing well" in the United States Air Force. (PSR, ¶64). The military interested Carlos, and after much consideration, Carlos decided to follow in his cousin's footsteps and enlisted in the Air Force in 1983. (PSR, ¶64). He was stationed in San Antonio, Texas; Minot, North Dakota; Fairbanks, Alaska; Pasadena, California; and South Korea. (PSR, ¶65). Carlos attained the rank of E3, Airman First Class and received the Air Force training ribbon. (PSR, ¶102). He received a General Discharge (Under Honorable Conditions) and left the Air Force in 1986. (PSR, ¶102).

While in the Air Force, Carlos served in the military police. (Ex. 1). As a security specialist, Carlos' most challenging assignment was the year he spent as a peacekeeper on the border between North Korea and South Korea. (Ex. 1). Though Carlos did not see active combat in the Air Force, his position exposed him to perilous and uncertain circumstances. Carlos had

4

"Top Secret" security clearance where, among other responsibilities, he was trained to patrol against crime, perform security checks for explosives, carry and authenticate missile codes, and secure airports. (Ex. 1). Carlos provided security for United States resources and assets. (Ex. 1).

This Court should enter a sentence of 28 months because of Carlos' considerable service to his country. "Our Nation has a long tradition of according leniency to veterans in recognition of their service." *Porter v. McCollum*, 558 U.S. 30 (2009) (citing Abbott, *The Civil War and the Crime Wave of 1865-70,* 1 Soc. Serv. Rev. 212, 232-234 (1927) (discussing the movement to pardon or parole prisoners who were veterans of the Civil War); and Rosenbaum, *The Relationship between War and Crime in the United States,* 30 J. Crim. L. & C. 722, 733-34 (1940) (describing a 1922 study by the Wisconsin Board of Control that discussed the number of veterans in the State and considered the "greater leniency that may be shown to ex-servicemen in court")). Consideration of military service has been reflected in sentencing courts' decisions. Carlos' service to his country is another reason why 28 months is the appropriate sentence.

3. *Carlos lives with his mother and serves as her primary caregiver*

Carlos lives with his mother, Lillian Smith, and serves as her primary caregiver. Lillian is in poor health as she suffers from hypertension, liver and kidney disease, and undergoes dialysis. (PSR, ¶60). Carlos' mother is weak and prone to falling, especially when she is by herself. (PSR, ¶60). Recently, she fell hard enough to sustain bruises to her face. (Ex. 1).

Lillian would be lost without her son. Carlos makes sure his mother has groceries in the house and hot food to eat. (Ex. 1). He counsels her on her nutritional needs, helps her with errands, cleans the house, picks up her medication, and drives her to her doctor's appointments. (Ex. 1). In short, he takes care of every aspect of her life. Lillian describes her son as a "good man" and a "caring man who takes care of everybody but himself." (PSR, ¶63). She says he has

5

a "heart for everyone" that needs him. (Ex. 3). Most recently, it has fallen to Carlos to drive his mother to her regular dialysis appointments. (Ex. 1). Dialysis has caused its own issues for Carlos' mother. On December 28, 2022, she was bleeding so profusely that, for a time, it looked as though she would require ambulance transport to a hospital for a blood transfusion. She trusts Carlos to take care of her, and absent the finances for in-home nursing care, she would be in dire straits without his assistance.

Carlos' cousin, Laurie Collier, mirrors Lillian's perspective when she writes "I would be remiss not to mention [Carlos'] relationship with his mom. He's very caring and he loves his mom so much. I always wished that my brother would love our mom the way that Carlos cares for his mother, again, this is a testament to his character and the type of person he is." (Ex. 4). Deron Glover, the moderator for the Leadership Council at First Baptist Church of Park Forest relates that since Carlos' mother has "fallen ill," Carlos is "there to take her to dialysis, doctor's appointment, and to get her medicine." (Ex. 5). Moreover, during the pandemic, when the church was closed, "Carlos and his mother were always there on Zoom every Sunday." (Ex. 5).

A defendant's role as a caregiver is a factor courts have considered when departing downward on the basis of family circumstances. In *United States v. Owens,* the Court affirmed a downward departure from level 34 (210 to 262 months) to level 32 (168 to 210 months) under 5H1.6 for a defendant who spent time every day with his brother, who suffered from Down syndrome and his common-law wife testified if he went to prison, "'she might have to move to public-assisted housing and receive welfare benefits.'" *Owens,* 145 F.3d 923 (7th Cir. 1998).

Similarly, as in *Owens,* this Court should consider Carlos' mother's declining health. His mother has neither the financial nor physical means to take care of herself without Carlos' assistance. Carlos' role as a caregiver shows a sentence of 28 months is appropriate.

> B. **A 28-month sentence adequately provides Carlos with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner**

Carlos has both mental health conditions and physical conditions that need attention and which he can get help with out of custody.

> 1. *Carlos has been battling depression, anxiety, and post-traumatic stress disorder since he served in the United States Air Force*

Carlos has coped with mental health issues for years that have only recently been diagnosed. After speaking with fellow veterans, he voluntarily saw a psychiatrist in 2019 and was diagnosed with post-traumatic stress disorder (PTSD). (Pretrial Services Report at 3). In 2020, Carlos was also diagnosed by a psychiatrist with severe depression and anxiety resulting from the end of his marriages. (PSR, ¶82). Carlos stopped attending sessions in May 2020 as sessions became virtual due to the COVID-19 pandemic and he preferred the in-person sessions. (Pretrial Services Report at 3). Additionally, due to his own COVID-19 diagnosis, his health was a priority. (Pretrial Services Report at 3).

On March 18, 2021, Carlos participated in a tele-psychiatric evaluation at South Suburban Council on Alcohol and Substance Abuse. (PSR, ¶83). He was diagnosed with major depression, specified trauma/stressor-related disorder, and alcohol use disorder (in remission). (PSR, ¶83). Carlos was referred to the VA Chicago Health Care System in Chicago for medication management, and was prescribed an antidepressant. (PSR, ¶83).

Carlos participated in monthly counseling from April 8, 2021, to April 15, 2022, and he completed 12 counseling sessions. (PSR, ¶83). Carlos related despite the pending case, he generally feels "okay." Yet, he is experiencing some anxiety, such as "trembling in his hands" and "unease with being in a small space." (PSR, ¶83). Carlos is willing to re-engage in services. (Ex. 1). He realizes he cannot cope with his mental health issues on his own and needs therapy to

overcome the issues plaguing him for years. Carlos' ongoing mental health issues, many of which stem from his time in the military, are another reason why 28 months is the appropriate sentence.

        2. *Carlos has been addressing his alcoholism and gambling addiction*

Carlos has been an alcoholic "for as long as I can remember." (Pretrial Services Report at 4). Carlos began drinking when he entered the Air Force in 1983 and explained "everyone drinks because that's all there was to do." (PSR, ¶87). He drank on almost a "daily basis" and certain people in his life, namely friends and some family members, were "triggers and temptations." (PSR, ¶87). Carlos first participated in substance abuse treatment in April 2015, though he realizes "he should've gotten help long ago…my drinking caused issues with my marriage and kids." (PSR, ¶87). Carlos stated he has been sober since approximately 2015 and, in addition to treatment, he attended Alcoholics Anonymous (AA) meetings weekly. (PSR, ¶87).

Beginning on May 14, 2018, Carlos participated in the residential drug aftercare program (RDAP) while in the Bureau of Prisons (BOP). (PSR, ¶90). Initially, Carlos' participation was reported as "poor." (PSR, ¶90). Yet after several weeks, Carlos started "actively participating in treatment by admitting he was not participating at an acceptable level during the first treatment episode, providing feedback to others, and being open-minded when feedback was directed at him." (PSR, ¶90).

Carlos recalls as part of the program, he had to pay money for restitution. (Ex. 1). One goal of the program was for Carlos to "find his own way" without relying on family members to assist him financially. (Ex. 1). According to reviews from RDAP, Carlos was "lying and manipulating loved ones for money." (PSR, ¶90). Carlos regrets that his behavior was described in this manner. Carlos would have preferred not to ask his family members for money. Still, he was desperate "not to be thrown out of the program for financial irresponsibility." (Ex. 1). Carlos

8

recalls he was trying to get a job.[2] However, he could not work in the kitchen, the woodshop, do janitorial work, or a myriad of other tasks because he could not wear boots or other safety footwear because of his constant foot pain from his years in the Air Force.[3] (Ex. 1). Carlos was committed to finding work, so he took classes to become a tutor. (Ex. 1). Carlos was successful and passed the training to become a tutor. (Ex. 1). However, for some period of time, Carlos, unfortunately, had no choice other than to ask his family members to help him. (Ex. 1).

Carlos completed phase II of RDAP treatment with "more humility and open-mindedness than he had ever mustered in the previous phases of treatment." (PSR, ¶90). Between March 18, 2021, and August 16, 2022, Carlos submitted 19 required urine samples for drug testing, all of which yielded negative results for the presence of controlled substances. (PSR, ¶91).

Carlos also voluntarily attended Gambler's Anonymous (GA) meetings from 2019 to 2020 as gambling has been an issue for him in the past. (Pretrial Services Report at 3). Carlos understands that gambling issues never go away and it is something he must live with. (*Id.*). For this reason, he has attended treatment and no longer participates in gambling activities. (*Id.*). He is still feeling the effects of bad gambling decisions he has made in the past. (*Id.*).

Carlos has battled alcohol and gambling addictions for much of his life. Yet, his recognition of these addictions and his desire to do better through treatment and counseling is another reason why 28 months is the appropriate sentence.

> 3. *Carlos is an aging prisoner who suffers from a number of chronic health issues for which more effective and less expensive medical care is available from the Veterans Administration*

---

[2] Carlos has always tried to better himself through education and training. Despite a notation that Carlos "did not obtain employment or participate in any educational/vocational training while residing at the SARRC [Salvation Army Pathway Forward Residential Reentry Center]" in November 2019, Carlos did participate. (PSR, ¶100). He went through a job service and an internet site to update his resume.
[3] Detailed in II(B)(3) *infra*.

9

In addition to caring for his mother, Carlos suffers from his own serious and debilitating health issues for which he receives care from the Veterans Administration (VA). (Ex. 6). He has been diagnosed with the following health conditions: bronchitis; diabetes mellitus type II; diverticulitis; duodenal ulcers; gastroesophageal reflux disorder; hypertension; obesity; rhinitis; and sickle trait. (PSR, ¶80). Carlos has been prescribed multiple medications he must take daily for these conditions. (PSR, ¶80). Most recently, Carlos was diagnosed with COVID-19. Since becoming ill with COVID-19, Carlos has had bronchial problems, dizziness, and breathing difficulties. (PSR, ¶78). There is no known treatment for these symptoms. (PSR, ¶78).

Additionally, in early December 2016, Carlos lost consciousness during dinner and experienced a series of symptoms (congestion, nosebleeds, and frequent colds) that were abnormal for him. (PSR, ¶76). After he lost consciousness, he was taken to the hospital for observation. (PSR, ¶76). Shortly thereafter, he was hospitalized at a different facility for three days after experiencing these symptoms. (PSR, ¶76). The tests were inconclusive, and he was referred to a liver disease specialist and cardiologist for further analysis. (PSR, ¶76). The specialists diagnosed unspecified "heart issues." (PSR, ¶76).

Carlos also experiences a "foot problem," which includes a "messed up arch" and a "messed up" toe. (PSR, ¶77). Carlos fell off a cliff while in the military and since then, he has been experiencing ongoing pain in his back, feet, and toes. (PSR, ¶77).

Carlos is 58 years old. According to U.S.S.G. § 5H1.1, "[a]ge may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration." Although 58 may not be old in the outside world, it is to the BOP and for sentencing purposes. In its report regarding the impact of the aging inmate population, the Office of the Inspector

General (OIG) defines prisoners 50 and older as "aging."[4] Not only is the incarcerated aging population increasing by staggering numbers, "aging inmates are more costly to incarcerate than their younger counterparts due to increased medical needs."[5]

Moreover, the staff at the BOP is largely ill-equipped to deal with medically challenged inmates. The OIG reports "limited institution staff and inadequate staff training affect the BOP's ability to address the needs of aging inmates and provide limited training for this purpose."[6] Further, older individuals face other substantial risks beyond their pre-existing medical conditions. "When prisons are at capacity or overcrowded, the risk of inmate injury, sexual victimization, disease transmission and death can increase."[7] Courts are uniform in holding medical care must be considered along with the guidelines. In *United States v. Wadena,* a 67-year-old defendant was convicted of mail fraud. *Wadena,* 470 F.3d 735 (8th Cir. 2006). While the guidelines range was 18 to 24 months, imposing a sentence of probation was proper in part because Wadena suffered from "chronic health conditions, including hearing loss, cataracts, Type II diabetes and kidney disease … [requiring] three-hour dialysis in a week." *Id.* Here, Carlos' age and serious medical needs should be considered when crafting the appropriate sentence.

### 4. Carlos has plans for the future

Despite the pressure of this pending case, Carlos is trying to plan for his future. Even while incarcerated, Carlos has always tried to turn a negative experience into something positive. According to the BOP, there is no disciplinary record for Carlos. (PSR, ¶48). Carlos has

---

[4] *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons,* Office of the Inspector General, U.S. Department of Justice (Feb. 2016) https://oig.justice.gov/reports/2015/e1505.pdf ("For the purpose of this review, we define inmates age 50 and older as aging.") [hereinafter "OIG Report"].
[5] *Id.* at i.
[6] *Id*.
[7] *Economic Perspectives on Incarceration and the Criminal Justice System*, Executive Office of the President, Council of Economic Advisors (Apr. 2016) https://obamawhitehouse.archives.gov/sites/whitehouse.gov/files/documents/CEA%2BCriminal%2BJustice%2BReport.pdf

11

participated in various education courses during his time in custody "including but not limited to nutrition, history, inmate transition, tutor training, re-entry workshop, personal finance, employment, computer, and basic real estate." (PSR, ¶48). Carlos would also like to re-engage in therapy and counseling for his mental health issues. With the exception of two occasions when Carlos was two days late in submitting urine samples for drug testing, he has been totally compliant with pretrial services. (PSR, ¶8).

The stress of this case has taken a toll on Carlos, but he knows he must look to the future. Carlos knows it is time to turn his life around. He understands he must take responsibility for his actions so this same situation does not recur. At 58 years old, Carlos realizes he is too old to continue to cycle in and out of the penitentiary. He is now engaged to his fiancée, Myosha Webb, whom he intends to marry when this case is behind him. Myosha would like this Court to know, "Carlos attends church and helps in the community. Carlos is a very loving and caring person. He would help anyone. Carlos stepped in to be a very supportive father figure in my children's and grandchildren's lives. I know Covid may have played a part in his bad decisions. When he got out Covid hit hard and had his world upside down. Me having Covid and then him. I know he was trouble about providing for household." (Ex. 7). Myosha continues, "I believe he has learned and except [sic] responsibility for his mistake. I believe due to current situations he was not in his right mind and was shaking up about the world shutting down to Covid." (Ex. 7).

Carlos has learned a person is more than the mistakes he has made, and mistakes do not define a person unless you let them. Carlos is extraordinarily sorry for the bad choices he has made and for violating Myosha's trust and the trust of his extended family. Carlos had neither the intention nor the desire to get caught up again in the criminal justice system, but when the pandemic struck, he found himself embroiled in illegal activity once again. Carlos believes that if

12

he, and Myosha, had not become extraordinarily ill with COVID-19, he would not have committed this crime.

Carlos looks forward to putting this case behind him and supporting himself and Myosha. He understands he must find employment outside of the finance sector and he must secure a job wherein he does not have access to a client's personal information. During his time in the BOP, Carlos took classes to better himself. He trained to become a tutor and learned how to prepare a resume. When Carlos enters the BOP after being sentenced on this case, he does so with the thought of learning a new skill, obtaining a certificate, or finding an area where he will be able to secure employment once he returns to life outside prison walls.

Carlos is willing to do whatever it takes to move on from these charges and achieve financial stability without resorting to criminal activity. Carlos envisions the day of his release from the penitentiary. In short, Carlos looks forward to making a productive life outside prison. In encountering his mother's failing health, Carlos has become well aware of his advancing years and his own mortality. He has no desire to spend another day of his life in custody.

### C. In imposing a sentence which reflect the seriousness of the offense, reflects adequate deterrence, promotes respect for the law, and is just punishment, a sentence of 28 months is appropriate

A sentence of 28 months followed by a period of supervised release is an appropriate sentence which reflects the seriousness of the offense, promotes respect for the law, is just punishment, and protects the public from future crimes.

Carlos is extraordinarily sorry for the acts that have brought him before this Court. He knows and understands what he did was wrong. However, at the time, he erroneously believed he had no choice. Carlos' financial desperation during the COVID-19 pandemic caused him to make poor choices and bad decisions. During the infancy of the pandemic, Carlos, like much of

13

the rest of the country, felt helpless. Carlos' fiancée, whom they both depended on for financial stability, lost her job as a bartender and could not work as an elder care provider. (Ex. 1). Then, both Carlos and his fiancée contracted COVID-19, and an untenable situation became unbearable. (Ex. 1). Since becoming ill with COVID-19, Carlos has had bronchial problems, dizziness, and breathing difficulties, thus compounding his worries. (PSR, ¶78).

Carlos grew hopeless as his medical bills piled up, the pandemic dragged on, and he struggled with the relentless symptoms of COVID-19. Carlos did not use the funds he obtained for extravagant vacations, luxury cars, designer clothes, or gourmet meals. (Ex. 1). He used the money to survive - to pay outstanding debts, to make sure he and his fiancée had a roof over their heads, clothes to wear, food to eat, and access to medical care. (Ex. 1).

Carlos was extremely concerned his VA benefits would not be sufficient to support himself and his fiancée, which led him to these actions. Carlos was desperate. He does not offer this as an excuse for his illicit actions, as he is well aware most people who fell ill with COVID-19 did not resort to criminal activity. He is sincerely remorseful as he knows he should have found a different solution, but he mistakenly believed he had no other options.

In its sentencing recommendation, probation argues "a sentence of 74 months, which is double the high end of the calculated guideline range *and commensurate with the previous term of incarceration imposed based on incremental punishment,* is recommended." (Probation Sentencing Recommendation[8] at 3) (emphasis added). While it is undisputed that Carlos' most recent sentence totaled 60 months, this sentence is taken into account when calculating his guidelines range. His criminal history category reflects this previous conviction, and the court is not obligated to match this sentence with Carlos' previous sentence.

---

[8] Hereinafter Prob. Sent. Rec.

Moreover, a sentence of 74 months would effectively be a death sentence for Carlos based on his age, physical and mental health history, and the devastating conditions in the BOP for aging prisoners. A term of 74 months would certainly be a death sentence for Carlos' ailing mother. Being able to continue as his mother's caretaker would also provide the impetus for Carlos to be a law-abiding citizen once he is released from custody. This is an outrageously high sentence for an individual who has pled guilty and taken responsibility for his actions. A 28-month sentence adequately addresses general and specific deterrence and is just punishment.

### III. OBJECTIONS AND CORRECTIONS TO THE PRESENTENCE REPORT

Paragraph 55 of the Presentence Report states Carlos was arrested on March 28, 2000, by the Huntington Park, CA Police Department for possessing a bad check, and the disposition is "unknown."[9] There is no evidence of a case being filed from this arrest. Therefore, Carlos respectfully requests the disposition be changed to "case closed" as there is no further information to be provided.

### IV. CONCLUSION

Carlos respectfully requests this Court impose a sentence of 28 months. This sentence takes the § 3553(a) factors into consideration, including Carlos' traumatic childhood, service in the United States Air Force, and medical needs. A sentence of 28 months is sufficient but not greater than necessary to reflect the purposes of punishment.

Respectfully submitted,

s/ Dena M. Singer
Dena M. Singer
Bedi & Singer, LLP
53 West Jackson Blvd., Suite 1505
Chicago, IL 60604

---

[9] With the passage of the First Step Act, the BOP has changed the screening process for defendants regarding early release. 18 U.S.C. § 3632(a)(7); 18 U.S.C. § 3624. Due to these changes, any previous criminal disposition that is unresolved, unknown, or without a clear disposition can prevent transfers or early release.

15

(312) 525 2017
dsinger@bedisinger.com
**Attorney for Defendant**

## Certificate of Service

I, Dena M. Singer, hereby certify, I caused a copy of the foregoing Motion to be served on upon the Assistant United States Attorney by causing it to be electronically filed with the Clerk of the Court using the CM/ECF system.

/s/ Dena M. Singer
Dena M. Singer